**Gregory BOURKE, et al., Plaintiffs**

v.

**Steve BESHEAR, et al., Defendants.**

**Civil Action No. 3:13–CV–750–H.**

United States District Court,
W.D. Kentucky.
at Louisville.

Signed Feb. 12, 2014.

Opinion Continuing Stay March 19, 2014.

---

543

Dawn R. Elliott, Fauver Law Office, Daniel J. Canon, Laura E. Landenwich, Leonard J. Dunman, IV, Louis Paz Winner, Clay Daniel Walton Adams PLC, Shannon Renee Fauver, Fauver Law Office, Louisville, KY, for Plaintiffs.

Brian Thomas Judy, Clay A. Barkley, Kentucky Attorney General—Civil & Environmental Law Div., Frankfort, KY, for Defendants.

### MEMORANDUM OPINION

JOHN G. HEYBURN II, District Judge.

Four same-sex couples validly married outside Kentucky have challenged the constitutionality of Kentucky's constitutional and statutory provisions that exclude them from the state recognition and benefits of marriage available to similarly situated opposite-sex couples.

While Kentucky unquestionably has the power to regulate the recognition of civil marriages, those regulations must comply with the Constitution of the United States. This court's role is not to impose its own political or policy judgments on the Commonwealth or its people. Nor is it to question the importance and dignity of the

institution of marriage as many see it. Rather, it is to discuss the benefits and privileges that Kentucky attaches to marital relationships and to determine whether it does so lawfully under our federal constitution.

From a constitutional perspective, the question here is whether Kentucky can justifiably deny same-sex spouses the recognition and attendant benefits it currently awards opposite-sex spouses. For those not trained in legal discourse, the questions may be less logical and more emotional. They concern issues of faith, beliefs, and traditions. Our Constitution was designed both to protect religious beliefs and prevent unlawful government discrimination based upon them. The Court will address all of these issues.

In the end, the Court concludes that Kentucky's denial of recognition for valid same-sex marriages violates the United States Constitution's guarantee of equal protection under the law, even under the most deferential standard of review. Accordingly, Kentucky's statutes and constitutional amendment that mandate this denial are unconstitutional.

## I.

No case of such magnitude arrives absent important history and narrative. That narrative necessarily discusses (1) society's evolution on these issues, (2) a look at those who now demand their constitutional rights, and (3) an explication of their claims. For most of Kentucky's history, the limitation of marriage to opposite-sex couples was assumed and unchallenged. Those who might have disagreed did so in silence. But gradual changes in our society, political culture and constitutional understandings have encouraged some to step forward and assert their rights.

## A.

In 1972, two Kentucky women stepped forward to apply for a marriage license. The Kentucky Supreme Court ruled that they were not entitled to one, noting that Kentucky statutes included neither a definition of "marriage" nor a prohibition on same-sex marriage. *Jones v. Hallahan,* 501 S.W.2d 588, 589 (Ky.App.1973). The court defined "marriage" according to common usage, consulting several dictionaries. It held that no constitutional issue was involved and concluded, "In substance, the relationship proposed . . . is not a marriage." *Id.* at 590. This view was entirely consistent with the then-prevailing state and federal jurisprudence. *See Baker v. Nelson,* 291 Minn. 310, 191 N.W.2d 185, 187 (1971), *appeal dismissed for want of a substantial federal question,* 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972); *Anonymous v. Anonymous,* 67 Misc.2d 982, 325 N.Y.S.2d 499, 501 (N.Y.Spec. Term 1971). A lot has changed since then.

Twenty-one long years later, the Hawaii Supreme Court first opened the door to same-sex marriage. *See Baehr v. Lewin,* 74 Haw. 530, 852 P.2d 44, 61 (1993) (ruling that the state's prohibition on same-sex marriage was discriminatory under the Hawaii Constitution and remanding to allow the state to justify its position). The reaction was immediate and visceral. In the next few years, twenty-seven states passed anti-same-sex marriage legislation,[1]

---

1. *See* ALA.CODE § 30–1–19 (2013); ARIZ.REV. STAT. ANN. §§ 25–101, –125 (2013); ARK.CODE ANN. §§ 9–11–208(b), –107(b) (West 2013); COLO REV.STAT. ANN. § 14–2–104 (West 2013); FLA. STAT ANN. § 741.212 (West 2013); GA. CODE ANN. § 19–3–3.1 (West 2013); HAW.REV. STAT. §§ 572–1, –1.6 (West 2013) (repealed 2011); IDAHO CODE ANN. § 32–209 (West 2013); 750 ILL. COMP. STAT. ANN. 5/212(a)(5), 5/213.1 (West 2013); IND CODE ANN. § 31–11–1–1 (West 2013); KAN. STAT. ANN. §§ 23–2501, 23–2508 (West 2013); LA. CIV.CODE ANN. art. 89, 3520 (2013); MICH. COMP. LAWS ANN. §§ 551.1, .271(2) (West 2013); MISS.CODE ANN. §§ 93–1–1(2) (West 2013); MO. ANN. STAT. § 451.022 (West 2013); MONT.CODE ANN. § 40–1–

and Congress passed the Defense of Marriage Act (DOMA).[2]

In 1998, Kentucky became one of those states, enacting new statutory provisions that (1) defined marriage as between one man and one woman, K.R.S. § 402.005; (2) prohibited marriage between members of the same sex, K.R.S. § 402.020(1)(d); (3) declared same-sex marriages contrary to Kentucky public policy, K.R.S. § 402.040(2); and (4) declared same-sex marriages solemnized out of state void and the accompanying rights unenforceable, K.R.S. § 402.045.[3]

Five years later, the Massachusetts Supreme Judicial Court declared that the state's own ban on same-sex marriage violated their state constitution. *Goodridge v. Dep't of Pub. Health,* 440 Mass. 309, 798 N.E.2d 941, 969 (2003). In May 2004, Massachusetts began marrying same-sex couples. In response, anti-same-sex marriage advocates in many states initiated campaigns to enact constitutional amendments to protect "traditional marriage." [4]

Like-minded Kentuckians began a similar campaign, arguing that although state law already prohibited same-sex marriage, a constitutional amendment would foreclose any possibility that a future court ruling would allow same-sex marriages to be performed or recognized in Kentucky. *See* S. Debate, 108th Cong., 2nd Sess. (Ky. 2004), ECF No. 38–6. The legislature placed such an amendment on the ballot. It contained only two sentences:

> Only a marriage between one man and one woman shall be valid or recognized as a marriage in Kentucky. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized.

Ky. Const. § 233A. Consequently, the amendment and Kentucky's statutes have

---

401(1)(d) (2013); N.C. Gen.Stat. Ann. § 51–1.2 (West 2013); N.D. Cent.Code Ann. §§ 14–03–01, –08 (West 2013); Okla. Stat. tit. 43, § 3.1 (2013); 23 Pa. Cons.Stat. Ann. §§ 1102, 1704 (West 2013); S.C.Code Ann. §§ 20–1–10, –15 (2013); S.D. Codified Laws §§ 25–1–1, –38 (2013); Tenn.Code Ann. § 36–3–113 (West 2013); Tex. Fam.Code Ann. §§ 1.103, 2.001 (West 2013); Utah Code Ann. § 30–1–2 (West 2013), invalidated by *Kitchen v. Herbert,* 961 F.Supp.2d 1181 (D.Utah 2013); Va.Code Ann. § 20–45.2 (West 2013); W. Va.Code Ann. §§ 48–2–104, –401 (West 2013).

**2.** The bill included commentary that stated: "a redefinition of marriage in Hawaii to include homosexual couples could make such couples eligible for a whole range of federal rights and benefits." H.R.Rep. No. 104–664, at 4–11, 1996 U.S.C.C.A.N. 2905, 2914 (1996).

**3.** The pertinent text of these provisions is:
402.005: As used and recognized in the law of the Commonwealth, "marriage" refers only to the civil status, condition, or relation of one (1) man and one (1) woman....
402.020: (1) Marriage is prohibited and void (d) Between members of the same sex.

402.040: (2) A marriage between members of the same sex is against Kentucky public policy and shall be subject to the prohibitions established in K.R.S. 402.045.
402.045: (1) A marriage between members of the same sex which occurs in another jurisdiction shall be void in Kentucky. (2) Any rights granted by virtue of the marriage, or its termination, shall be unenforceable in Kentucky courts.
Ky.Rev.Stat. Ann. §§ 402.005–.045 (West 2013).

**4.** States passing constitutional amendments banning same-sex marriage in 2004 include Arkansas, Georgia, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Montana, North Dakota, Ohio, Oklahoma, Oregon, and Utah. Other states followed suit: in 2005, Kansas and Texas; in 2006, Alabama, Colorado, Idaho, South Carolina, South Dakota, Tennessee, Virginia, and Wisconsin; in 2008, Arizona, California, and Florida; and in 2012, North Carolina. Alaska passed its constitutional ban in 1998, and Nebraska and Nevada did so in 2000. California's, Utah's, and Oklahoma's constitutional bans have since been overturned.

much the same effect. On November 2, 2004, approximately 74% of participating voters approved the Amendment.[5]

Kentucky's same-sex marriage legal framework has not changed since. In the last decade, however, a virtual tidal wave of legislative enactments and judicial judgments in other states have repealed, invalidated, or otherwise abrogated state laws restricting same-sex couples' access to marriage and marriage recognition.[6]

### B.

In many respects, Plaintiffs here are average, stable American families.

Gregory Bourke and Michael Deleon reside in Louisville, Kentucky and have been together for 31 years. They were lawfully married in Ontario, Canada in 2004 and have two minor children who are also named Plaintiffs: a 14–year–old girl; and a 15–year–old boy. Jimmy Meade and Luther Barlowe reside in Bardstown, Kentucky and have been together 44 years. They were lawfully married in Davenport, Iowa in 2009. Randell Johnson and Paul Campion reside in Louisville, Kentucky and have been together for 22 years. They were lawfully married in Riverside, California in 2008 and have four minor children who are named Plaintiffs: twin 18–year–old boys; a 14–year–old boy; and a 10–year–old girl. Kimberly Franklin and Tamera Boyd reside in Cropper, Kentucky.[7] They were lawfully married in Stratford, Connecticut in 2010.

Collectively, they assert that Kentucky's legal framework denies them certain rights and benefits that validly married opposite-sex couples enjoy. For instance, a same-sex surviving spouse has no right to an inheritance tax exemption and thus must pay higher death taxes. They are not entitled to the same healthcare benefits as opposite-sex couples; a same-sex spouse must pay to add their spouse to their employer-provided health insurance, while opposite-sex spouses can elect this option free of charge. Same-sex spouses and their children are excluded from intestacy laws governing the disposition of estate assets upon death. Same-sex spouses and their children are precluded from recovering loss of consortium damages in civil litigation following a wrongful death. Under Kentucky's workers compensation law, same-sex spouses have no legal standing to sue and recover as a result of their spouse's fatal workplace injury.

Moreover, certain federal protections are available only to couples whose marriage is legally recognized by their home state. For example, a same-sex spouse in Kentucky cannot take time off work to care for a sick spouse under the Family Medical Leave Act. 29 C.F.R. § 825.122(b).

---

**5.** 53.6% of Kentucky's registered voters participated.

**6.** Recognition by legislation and by popular vote has occurred in Vermont (Apr. 7, 2009), New Hampshire (June 3, 2009), District of Columbia (Dec. 18, 2009), New York (June 24, 2011), Washington (Nov. 6, 2012), Maine (Nov. 6, 2012), Maryland (Nov. 6, 2012), Delaware (May 7, 2013), Minnesota (May 14, 2013), Rhode Island (May 2, 2013), Hawaii (Nov. 13, 2013), and Illinois (Nov. 20, 2013) (effective June 1, 2014). State and federal court judgments have occurred in Massachusetts, Connecticut, Iowa, California, New Jersey, New Mexico, Utah, and Oklahoma. The Utah and Oklahoma decisions are currently being appealed.

**7.** Plaintiffs Franklin and Boyd are residents of Shelby County and originally filed suit in the Eastern District of Kentucky. Judge Gregory Van Tatenhove granted Plaintiffs and Defendants' joint motion for change of venue pursuant to 28 U.S.C. § 1404 to the Western District of Kentucky. The case was assigned to Judge Thomas Russell, who transferred it here in the interest of judicial economy and to equalize the docket. Although the cases were not consolidated, Plaintiffs here subsequently added Franklin and Boyd to this action in their Second Amended Complaint.

In addition, a same-sex spouse in Kentucky is denied access to a spouse's social security benefits. 42 U.S.C. § 416(h)(1)(A)(i). No one denies these disparities.

Finally, Plaintiffs assert additional noneconomic injuries as well. They say that Kentucky's laws deny them "a dignity and status of immense import," stigmatize them, and deny them the stabilizing effects of marriage that helps keep couples together. Plaintiffs also allege injuries to their children including: (1) a reduction in family resources due to the State's differential treatment of their parents, (2) stigmatization resulting from the denial of social recognition and respect, (3) humiliation, and (4) harm from only one parent being able to be listed as an adoptive parent—the other being merely their legal guardian.

### C.

Plaintiffs advance six primary claims under 42 U.S.C. § 1983: (1) deprivation of the fundamental right to marry in violation of the Due Process Clause of the Fourteenth Amendment; (2) discrimination on the basis of sexual orientation in violation of the Equal Protection Clause of the Fourteenth Amendment;[8] (3) discrimination against same-sex couples in violation of the freedom of association guaranteed by the First Amendment; (4) failure to recognize valid public records of other states in violation of the Full Faith and Credit Clause of Article IV, Section 1; (5) deprivation of the right to travel in violation of the Due Process Clause of the Fourteenth Amendment; and (6) establishment of a religious definition of marriage in violation of the Establishment Clause of the First Amendment.[9] Plaintiffs seek an order enjoining the State from enforcing the pertinent constitutional and statutory provisions.

While Plaintiffs have many constitutional theories, the Fourteenth Amendment's Equal Protection Clause provides the most appropriate analytical framework.[10] If equal protection analysis decides this case, the Court need not address any others. No one disputes that the same-sex couples who have brought this case are treated differently under Kentucky law than those in comparable opposite-sex marriages. No one seems to disagree that, as presented here, the equal protection issue is purely a question of law. The Court must decide whether the Kentucky Constitution and statutes violate Plaintiffs' federal constitutional rights.

### II.

Before addressing the substance of equal protection analysis, the Court must first determine the applicable standard of

---

**8.** In their Second Amended Complaint, Plaintiffs also alleged discrimination on the basis of sex. However, the current motion before the Court does not mention any such basis. Therefore, the Court will construe this claim to allege only discrimination based on sexual orientation.

**9.** Plaintiffs also seek a declaration that Section 2 of the Defense of Marriage Act (DOMA), 28 U.S.C. § 1738C, as applied to Plaintiffs and similarly situated same-sex couples violates the Due Process, Equal Protection, Freedom of Association, and Full Faith and Credit clauses of the United States Constitution. The Court finds that Section 2 of DOMA, as a permissive statute, is not necessary to the disposition of Plaintiffs' case and therefore will not analyze its constitutionality.

**10.** The Fourteenth Amendment to the U.S. Constitution provides, in pertinent part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV § 1.

review. Rational basis review applies unless Kentucky's laws affect a suspect class of individuals or significantly interfere with a fundamental right. *Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978).

### A.

The Kentucky provisions challenged here impose a classification based on sexual orientation. Barely seven months ago, the Supreme Court issued a historic opinion applying equal protection analysis to federal non-recognition of same-sex marriages. *United States v. Windsor*, —— U.S. ——, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013).[11] Although the majority opinion covered many topics, it never clearly explained the applicable standard of review. Some of Justice Kennedy's language corresponded to rational basis review. *See id.* at 2696 ("no legitimate purpose overcomes the purpose and effect to disparage and to injure...."). However, the scrutiny that the Court actually applied does not so much resemble it. *See id.* at 2706 (Scalia, J., dissenting) (the majority "does not apply strict scrutiny, and [although] its central propositions are taken from rational basis cases ... the Court certainly does not *apply* anything that resembles that deferential framework.") (emphasis in original). So, we are left without a clear answer.

The Sixth Circuit has said that sexual orientation is not a suspect classification and thus is not subject to heightened scrutiny. *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir.2012) (citing *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir.2006)). Though *Davis* concerned slightly different circumstances, it would seem to limit the Court's independent assessment of the question. *Accord Bassett v. Snyder*, 951 F.Supp.2d 939, 961 (E.D.Mich.2013).

It would be no surprise, however, were the Sixth Circuit to reconsider its view. Several theories support heightened review. *Davis* based its decision on a line of cases relying on *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), which has since been overruled by *Lawrence v. Texas*, 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) ("*Bowers* was not correct when it was decided, and it is not correct today.").[12] Recently, several courts, including the Ninth Circuit, have held that classifications based on sexual orientation are subject to heightened scrutiny. *See SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 483 (9th Cir.2014) (finding that *Windsor* employed heightened scrutiny).

Moreover, a number of reasons suggest that gay and lesbian individuals do constitute a suspect class. They seem to share many characteristics of other groups that

**11.** In *Windsor*, the state of New York enacted legislation recognizing same-sex marriages performed out of state and later amended its own laws to permit same-sex marriage. Section 3 of the Defense of Marriage Act (DOMA) denied recognition to same-sex marriages for the purposes of federal law. As a result of DOMA, a same-sex spouse did not qualify for the marital exemption from the federal estate tax. She brought an action challenging the constitutionality of Section 3 of DOMA in federal court. The *Windsor* Court applied Fifth Amendment due process and equal protection analysis to the plaintiff's challenge of a federal statute. Our case involves a challenge to a state constitutional provision and state statutes, thus falling under the protections of the Fourteenth Amendment, which is subject to the same substantive analysis.

**12.** Indeed, one district court in this Circuit has found that *Lawrence* destroyed the jurisprudential foundation of *Davis's* line of Sixth Circuit cases, thus leaving the level of scrutiny an open question for lower courts to resolve. *See Obergefell v. Wymyslo*, 962 F.Supp.2d at 986–87 (S.D.Ohio 2013).

are afforded heightened scrutiny, such as historical discrimination, immutable or distinguishing characteristics that define them as a discrete group, and relative political powerlessness. *See Lyng v. Castillo,* 477 U.S. 635, 638, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986). Further, their common characteristic does not impair their ability to contribute to society. *See City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 440–41, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

All of these arguments have merit. To resolve the issue, however, the Court must look to *Windsor* and the Sixth Circuit. In *Windsor,* no clear majority of Justices stated that sexual orientation was a suspect category.

### B.

Supreme Court jurisprudence suggests that the right to marry is a fundamental right. *See Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) ("Marriage is one of the 'basic civil rights of man,' fundamental to our existence and survival" (quoting *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942))); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (the right to marry is a central part of Due Process liberty); *Maynard v. Hill,* 125 U.S. 190, 205, 8 S.Ct. 723, 31 L.Ed. 654 (1888) (marriage creates "the most important relation in life"). The right to marry also implicates the right to privacy and the right to freedom of association. *Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (marriage involves a "right of privacy older than the Bill of Rights"); *M.L.B. v. S.L.J.,* 519 U.S. 102, 116, 117 S.Ct. 555,

136 L.Ed.2d 473 (1996) ("Choices about marriage ... are among associational rights this Court has ranked 'of basic importance in our society'" and are protected under the Fourteenth Amendment (quoting *Boddie v. Connecticut,* 401 U.S. 371, 376, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971))).

Despite this comforting language, neither the Supreme Court nor the Sixth Circuit has stated that the fundamental right to marry includes a fundamental right to marry someone of the same sex. Moreover, Plaintiffs do not seek the right to marry in Kentucky. Rather, they challenge the State's lack of recognition for their validly solemnized marriages.[13]

To resolve the issue, the Court must again look to *Windsor.* In *Windsor,* the Supreme Court did not clearly state that the non-recognition of marriages under Section 3 of DOMA implicated a fundamental right, much less significantly interfered with one. Therefore, the Court will apply rational basis review. Ultimately, the result in this case is unaffected by the level of scrutiny applied.

### C.

Under this standard, the Court must determine whether these Kentucky laws are rationally related to a legitimate government purpose. Plaintiffs have the burden to prove either that there is no conceivable legitimate purpose for the law or that the means chosen to effectuate a legitimate purpose are not rationally related to that purpose. This standard is highly deferential to government activity but is surmountable, particularly in the context of discrimination based on sexual orientation. "Rational basis review, while deferential, is

---

**13.** Some courts have construed the right to marry to include the right to remain married. *See, e.g., Obergefell v. Wymyslo,* 962 F.Supp.2d 968 (S.D.Ohio 2013). The logic is that Kentucky's laws operate to render Plaintiffs' mar-

riage invalid in the eyes of state law. This could amount to a functional deprivation of Plaintiffs' lawful marriage, and therefore a deprivation of liberty. *See id.* at 977–79.

not 'toothless.'" *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 532 (6th Cir.1998) (quoting *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976)). This search for a rational relationship "ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer v. Evans*, 517 U.S. 620, 633, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Even under this most deferential standard of review, courts must still "insist on knowing the *relation* between the classification adopted and the object to be attained." *Id.* at 632, 116 S.Ct. 1620 (emphasis added).

### III.

In a democracy, the majority routinely enacts its own moral judgments as laws. Kentucky's citizens have done so here. Whether enacted by a legislature or by public referendum, those laws are subject to the guarantees of individual liberties contained within the United States Constitution. *Windsor*, 133 S.Ct. at 2691; *see e.g., Loving*, 388 U.S. at 12, 87 S.Ct. 1817 (statute prohibiting interracial marriage violated equal protection).

Ultimately, the focus of the Court's attention must be upon Justice Kennedy's majority opinion in *Windsor*. While Justice Kennedy did not address our specific issue, he did address many others closely related. His reasoning about the legitima-

cy of laws excluding recognition of same-sex marriages is instructive. For the reasons that follow, the Court concludes that Kentucky's laws are unconstitutional.

### A.

In *Windsor*, Justice Kennedy found that by treating same-sex married couples differently than opposite-sex married couples, Section 3 of DOMA "violate[d] basic due process and equal protection principles applicable to the Federal Government." *Windsor*, 133 S.Ct. at 2693. His reasoning establishes certain principles that strongly suggest the result here.[14]

■ The first of those principles is that the actual purpose of Kentucky's laws is relevant to this analysis to the extent that their purpose and principal effect was to treat two groups differently. *Id.* As described so well by substituting our particular circumstances within Justice Kennedy's own words, that principle applies quite aptly here:

> [Kentucky's laws'] principal effect is to identify a subset of state-sanctioned marriages and make them unequal. The principal purpose is to impose inequality, not for other reasons like governmental efficiency.

*Id.* at 2694. The legislative history of Kentucky's laws clearly demonstrates the intent to permanently prevent the recognition of same-sex marriage in Kentucky.[15]

---

**14.** Indeed, Justice Scalia stated that *Windsor* indicated the way the Supreme Court would view future cases involving same-sex marriage "beyond mistaking." 133 S.Ct. at 2709 (Scalia, J., dissenting).

**15.** Senate Bill 245 proposed the amendment to the Kentucky Constitution. The bill's sponsor, state senator Vernie McGaha said:

> Marriage is a divine institution designed to form a permanent union between man and woman.... [T]he scriptures make it the most sacred relationship of life, and nothing could be more contrary to the spirit

than the notion that a personal agreement ratified in a human court satisfies the obligation of this ordinance.... [I]n First Corinthians 7:2, if you notice the pronouns that are used in this scripture, it says, 'Let every man have *his* own wife, and let every woman have *her* own husband.' The Defense of Marriage Act, passed in 1996 by Congress, defined marriage for the purpose of federal law as the legal union between one man and one woman. And while Kentucky's law did prohibit the same thing, in '98 we passed a statute that gave it a little more strength and assured that such unions in other states and countries also would not be

Whether that purpose also demonstrates an obvious animus against same-sex couples may be debatable. But those two motivations are often different sides of the same coin.

The second principle is that such an amendment demeans one group by depriving them of rights provided for others. As Justice Kennedy would say:

> Responsibilities, as well as rights, enhance the dignity and integrity of the person. And [Kentucky's laws] contrive[ ] to deprive some couples [married out of state], but not other couples [married out of state], of both rights and responsibilities. By creating two contradictory marriage regimes within the

same State, [Kentucky's laws] force[ ] same-sex couples to live as married for the purpose of [federal law] but unmarried for the purpose of [Kentucky] law.... This places same-sex couples [married out of state] in an unstable position of being in a second-tier marriage [in Kentucky]. The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, see *Lawrence*, 539 U.S. 558, 123 S.Ct. 2472.

*Id.* Under Justice Kennedy's logic, Kentucky's laws burden the lives of same-sex spouses by preventing them from receiving certain state and federal governmental benefits afforded to other married couples. *Id.* Those laws "instruct[ ] all ... officials,

---

recognized here. There are similar laws across 38 states that express an overwhelming agreement in our country that we should be protecting the institute [*sic*] of marriage. Nevertheless this institution of marriage is under attack by judges and elected officials who would legislate social policy that has already been in place for us for many, many years.... In May of this year, Massachusetts will begin issuing marriage licenses to same-sex couples.... We in the legislature, I think, have no other choice but to protect our communities from the desecration of these traditional values.... Once this amendment passes, no activist judge, no legislature or county clerk whether in the Commonwealth or outside of it will be able to change this fundamental fact: the sacred institution of marriage joins together a man and a woman for the stability of society and for the greater glory of God.

S. DEBATE, 108TH CONG., 2ND SESS. (Ky. 2004), ECF No. 38–6 at 1:00:30–1:05:10. Similarly, cosponsor state senator Gary Tapp proclaimed:

> For many years, Kentucky has had laws that define marriage as one man and one woman, and in 1998, the General Assembly did strengthen those laws ensuring that same-sex marriages performed in other states or countries would not be recognized here.... While we're not proposing any new language regarding the institution of marriage in Kentucky, this pro-marriage

constitutional amendment will solidify existing law so that even an activist judge cannot question the definition of marriage according to Kentucky law.... [W]hen the citizens of Kentucky accept this amendment, no one, no judge, no mayor, no county clerk, will be able to question their beliefs in the traditions of stable marriages and strong families.

*Id.* at 1:05:43–1:07:45. The final state senator to speak on behalf of the bill, Ed Worley, said that the bill was not intended to be a discrimination bill. *Id.* at 1:26:10. However, he offered no other purpose other than reaffirming the historical and Biblical definition of marriage. *See, e.g., id.* at 1:26:20–1:26:50.

> One state senator, Ernesto Scorsone, spoke out against the constitutional amendment. He said:
>
> The efforts to amend the U.S. Constitution over the issue of interracial marriage failed despite repeated religious arguments and Biblical references.... The proposal today is a shocking departure from [our constitutional] principles.... To institutionalize discrimination in our constitution is to turn the document on its head. To allow the will of the majority to forever close the door to a minority, no matter how disliked, to any right, any privilege, is an act of political heresy.... Their status will be that of second-class citizens forever.... Discrimination and prejudices will not survive the test of time.

*Id.* at 1:16:07–1:24:00.

and indeed all persons with whom same-sex couples interact, including their own children, that their marriage is less worthy than the marriages of others." *Id.* at 2696. Indeed, Justice Kennedy's analysis would seem to command that a law refusing to recognize valid out-of-state same-sex marriages has only one effect: to impose inequality.

From this analysis, it is clear that Kentucky's laws treat gay and lesbian persons differently in a way that demeans them. Absent a clear showing of animus, however, the Court must still search for any rational relation to a legitimate government purpose.

### B.

The State's sole justification for the challenged provisions is: "the Commonwealth's public policy is rationally related to the legitimate government interest of preserving the state's institution of traditional marriage." Certainly, these laws do further that policy.

That Kentucky's laws are rooted in tradition, however, cannot alone justify their infringement on individual liberties. *See Heller v. Doe,* 509 U.S. 312, 326, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ("Ancient lineage of a legal concept does not give it immunity from attack for lacking a rational basis."); *Williams v. Illinois,* 399 U.S. 235, 239, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970) ("[N]either the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack...."). Over the past forty years, the Supreme Court has refused to allow mere tradition to justify marriage statutes that violate individual liberties. *See, e.g., Loving,* 388 U.S. at 12, 87 S.Ct. 1817 (states cannot prohibit interracial marriage); *Lawrence,* 539 U.S. at 577–78, 123 S.Ct. 2472 (states cannot criminalize private, consensual sexual conduct); *Nev. Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 733–

35, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) (states cannot act based on stereotypes about women's assumption of primary childcare responsibility). Justice Kennedy restated the principle most clearly: " '[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice....' " *Lawrence,* 539 U.S. at 577, 123 S.Ct. 2472 (quoting *Bowers,* 478 U.S. at 216, 106 S.Ct. 2841 (Stevens, J., dissenting)). Justice Scalia was more blunt, stating that " 'preserving the traditional institution of marriage' is just a kinder way of describing the State's *moral disapproval* of same-sex couples." *Id.* at 601, 123 S.Ct. 2472 (Scalia, J., dissenting) (emphasis in original).

Usually, as here, the tradition behind the challenged law began at a time when most people did not fully appreciate, much less articulate, the individual rights in question. For years, many states had a tradition of segregation and even articulated reasons why it created a better, more stable society. Similarly, many states deprived women of their equal rights under the law, believing this to properly preserve our traditions. In time, even the most strident supporters of these views understood that they could not enforce their particular moral views to the detriment of another's constitutional rights. Here as well, sometime in the not too distant future, the same understanding will come to pass.

### C.

The Family Trust Foundation of Kentucky, Inc. submitted a brief as *amicus curiae* which cast a broader net in search of reasons to justify Kentucky's laws. It offered additional purported legitimate interests including: responsible procreation and childrearing, steering naturally pro-

creative relationships into stable unions, promoting the optimal childrearing environment, and proceeding with caution when considering changes in how the state defines marriage. These reasons comprise all those of which the Court might possibly conceive.

The State, not surprisingly, declined to offer these justifications, as each has failed rational basis review in every court to consider them post-*Windsor*, and most courts pre-*Windsor*. *See, e.g., Bishop v. United States ex rel. Holder*, 962 F.Supp.2d 1252, 1290–96 (N.D.Okla.2014) (responsible procreation and childrearing, steering naturally procreative relationships into stable unions, promoting the ideal family unit, and avoiding changes to the institution of marriage and unintended consequences); *Kitchen v. Herbert*, 961 F.Supp.2d 1181, 1211–14 (D.Utah 2013) (responsible procreation, optimal childrearing, proceeding with caution); *Obergefell v. Wymyslo*, 962 F.Supp.2d 968, 993–95 (S.D.Ohio 2013) (optimal childrearing). The Court fails to see how having a family could conceivably harm children. Indeed, Justice Kennedy explained that it was the government's failure to recognize same-sex marriages that harmed children, not having married parents who happened to be of the same sex:

> [I]t humiliates tens of thousands of children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives.

*Windsor*, 133 S.Ct. at 2694.

As in other cases that have rejected the amicus's arguments, no one in this case has offered factual or rational reasons why Kentucky's laws are rationally related to any of these purposes. Kentucky does not require proof of procreative ability to have an out-of-state marriage recognized. The exclusion of same-sex couples on procreation grounds makes just as little sense as excluding post-menopausal couples or infertile couples on procreation grounds. After all, Kentucky allows gay and lesbian individuals to adopt children. And no one has offered evidence that same-sex couples would be any less capable of raising children or any less faithful in their marriage vows. Compare this with Plaintiffs, who have not argued against the many merits of "traditional marriage." They argue only that they should be allowed to enjoy them also.

Other than those discussed above, the Court cannot conceive of any reasons for enacting the laws challenged here. Even if one were to conclude that Kentucky's laws do not show animus, they cannot withstand traditional rational basis review.

### D.

The Court is not alone in its assessment of the binding effects of Supreme Court jurisprudence, particularly Justice Kennedy's substantive analysis articulated over almost two decades.

Nine state and federal courts have reached conclusions similar to those of this Court. After the Massachusetts Supreme Judicial Court led the way by allowing same-sex couples to marry, five years later the Connecticut Supreme Court reached a similar conclusion regarding its state constitution on equal protection grounds. *Kerrigan v. Comm'r of Pub. Health*, 289 Conn. 135, 957 A.2d 407, 482 (2008). Other courts soon began to follow. *See Varnum v. Brien*, 763 N.W.2d 862, 907 (Iowa 2009) (holding that banning same-sex marriage violated equal protection as guaranteed by the Iowa Constitution); *Perry v. Schwarzenegger*, 704 F.Supp.2d 921, 1003 (N.D.Cal.2010) (holding that the state's constitutional ban on same-sex marriage

enacted via popular referendum violated the Equal Protection and Due Process clauses of the Fourteenth Amendment to the United States Constitution) *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052 (9th Cir.2012) *vacated and remanded sub nom. Hollingsworth v. Perry*, —— U.S. ——, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013); *Garden State Equality v. Dow*, 434 N.J.Super. 163, 82 A.3d 336, 367–68 (2013) (holding that disallowing same-sex marriage violated the New Jersey Constitution, and the governor withdrew the state's appeal); *Griego v. Oliver*, 316 P.3d 865, 872 (N.M. 2013) (holding that denying same-sex couples the right to marry violated the state constitution's equal protection clause).

Over the last several months alone, three federal district courts have issued well-reasoned opinions supporting the rights of non-heterosexual persons to marriage equality in similar circumstances. *See Bishop*, 962 F.Supp.2d at 1258–59 (holding that the state's ban on same-sex marriage violated the Equal Protection Clause of the Fourteenth Amendment); *Obergefell*, 962 F.Supp.2d at 972–74 (holding that Ohio's constitutional and statutory ban on the recognition of same-sex marriages validly performed out-of-state was unconstitutional as applied to Ohio death certificates); *Kitchen*, 961 F.Supp.2d at 1187–88 (holding that the state's constitutional and statutory ban on same-sex marriage violated the Equal Protection and Due Process clause of the Fourteenth Amendment).

Indeed, to date, all federal courts that have considered same-sex marriage rights post-*Windsor* have ruled in favor of same-sex marriage rights. This Court joins in general agreement with their analyses.

### IV.

For many, a case involving these issues prompts some sincere questions and concerns. After all, recognizing same-sex marriage clashes with many accepted norms in Kentucky—both in society and faith. To the extent courts clash with what likely remains that majority opinion here, they risk some of the public's acceptance. For these reasons, the Court feels a special obligation to answer some of those concerns.

### A.

Many Kentuckians believe in "traditional marriage." Many believe what their ministers and scriptures tell them: that a marriage is a sacrament instituted between God and a man and a woman for society's benefit. They may be confused—even angry—when a decision such as this one seems to call into question that view. These concerns are understandable and deserve an answer.

Our religious beliefs and societal traditions are vital to the fabric of society. Though each faith, minister, and individual can define marriage for themselves, at issue here are laws that act outside that protected sphere. Once the government defines marriage and attaches benefits to that definition, it must do so constitutionally. It cannot impose a traditional or faith-based limitation upon a public right without a sufficient justification for it. Assigning a religious or traditional rationale for a law, does not make it constitutional when that law discriminates against a class of people without other reasons.

The beauty of our Constitution is that it accommodates our individual faith's definition of marriage while preventing the government from unlawfully treating us differently. This is hardly surprising since it was written by people who came to America to find both freedom of religion and freedom from it.

## B.

Many others may wonder about the future of marriages generally and the right of a religion or an individual church to set its own rules governing it. For instance, must Kentucky now allow same-sex couples to marry in this state? Must churches now marry same-sex couples? How will this decision change or affect my marriage?

First, the Court was not presented with the particular question whether Kentucky's ban on same-sex marriage is constitutional. However, there is no doubt that *Windsor* and this Court's analysis suggest a possible result to that question.

Second, allowing same-sex couples the state recognition, benefits, and obligations of marriage does not in any way diminish those enjoyed by opposite-sex married couples. No one has offered any evidence that recognizing same-sex marriages will harm opposite-sex marriages, individually or collectively. One's belief to the contrary, however sincerely held, cannot alone justify denying a selected group their constitutional rights.

Third, no court can require churches or other religious institutions to marry same-sex couples or any other couple, for that matter. This is part of our constitutional guarantee of freedom of religion. That decision will always be based on religious doctrine.

What this opinion does, however, is make real the promise of equal protection under the law. It will profoundly affect validly married same-sex couples' experience of living in the Commonwealth and elevate their marriage to an equal status in the eyes of state law.

## C.

Many people might assume that the citizens of a state by their own state constitution can establish the basic principles of governing their civil life. How can a single judge interfere with that right?

It is true that the citizens have wide latitude to codify their traditional and moral values into law. In fact, until after the Civil War, states had almost complete power to do so, unless they encroached on a specific federal power. *See Barron v. City of Baltimore*, 32 U.S. 243, 250–51, 7 Pet. 243, 8 L.Ed. 672 (1833). However, in 1868 our country adopted the Fourteenth Amendment, which prohibited state governments from infringing upon our individual rights. Over the years, the Supreme Court has said time and time again that this Amendment makes the vast majority of the original Bill of Rights and other fundamental rights applicable to state governments.

In fact, the first justice to articulate this view was one of Kentucky's most famous sons, Justice John Marshall Harlan. *See Hurtado v. California*, 110 U.S. 516, 558, 4 S.Ct. 111, 28 L.Ed. 232 (1884) (Harlan, J., dissenting). He wrote that the Fourteenth Amendment "added greatly to the dignity and glory of American citizenship, and to the security of personal liberty, by declaring that . . . 'no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.'" *Plessy v. Ferguson*, 163 U.S. 537, 555, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting) (quoting U.S. Const. amend. XIV).

So now, the Constitution, including its equal protection and due process clauses, protects all of us from government action at any level, whether in the form of an act by a high official, a state employee, a legislature, or a vote of the people adopting a constitutional amendment. As Chief

Justice John Marshall said, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60 (1803). Initially that decision typically rests with one judge; ultimately, other judges, including the justices of the Supreme Court, have the final say. That is the way of our Constitution.

### D.

For many others, this decision could raise basic questions about our Constitution. For instance, are courts creating new rights? Are judges changing the meaning of the Fourteenth Amendment or our Constitution? Why is all this happening so suddenly?

The answer is that the right to equal protection of the laws is not new. History has already shown us that, while the Constitution itself does not change, our understanding of the meaning of its protections and structure evolves.[16] If this were not so, many practices that we now abhor would still exist.

Contrary to how it may seem, there is nothing sudden about this result. The body of constitutional jurisprudence that serves as its foundation has evolved gradually over the past forty-seven years. The Supreme Court took its first step on this journey in 1967 when it decided the landmark case *Loving v. Virginia,* which declared that Virginia's refusal to marry mixed-race couples violated equal protection. The Court affirmed that even areas such as marriage, traditionally reserved to the states, are subject to constitutional scrutiny and "must respect the constitu-

tional rights of persons." *Windsor,* 133 S.Ct. at 2691 (citing *Loving* ).

Years later, in 1996, Justice Kennedy first emerged as the Court's swing vote and leading explicator of these issues in *Romer v. Evans. Romer,* 517 U.S. at 635, 116 S.Ct. 1620 (holding that Colorado's constitutional amendment prohibiting all legislative, executive, or judicial action designed to protect homosexual persons violated the Equal Protection Clause). He explained that if the " 'constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.' " *Id.* at 634–35, 116 S.Ct. 1620 (emphasis in original) (quoting *Dep't of Agric. v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)). These two cases were the virtual roadmaps for the cases to come next.

In 2003, Justice Kennedy, again writing for the majority, addressed another facet of the same issue in *Lawrence v. Texas,* explaining that sexual relations are "but one element in a personal bond that is more enduring" and holding that a Texas statute criminalizing certain sexual conduct between persons of the same sex violated the Constitution. 539 U.S. at 567, 123 S.Ct. 2472. Ten years later came *Windsor.* And, sometime in the next few years at least one other Supreme Court opinion will likely complete this judicial journey.

---

**16.** The Supreme Court in *Lawrence v. Texas* explained:

> Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight.

> They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.

539 U.S. at 578–79, 123 S.Ct. 2472.

So, as one can readily see, judicial thinking on this issue has evolved ever so slowly. That is because courts usually answer only the questions that come before it. Judge Oliver Wendell Holmes aptly described this process: "[J]udges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions." *S. Pac. Co. v. Jensen,* 244 U.S. 205, 221, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting). In *Romer, Lawrence,* and finally, *Windsor,* the Supreme Court has moved interstitially, as Holmes said it should, establishing the framework of cases from which district judges now draw wisdom and inspiration. Each of these small steps has led to this place and this time, where the right of same-sex spouses to the state-conferred benefits of marriage is virtually compelled.

The Court will enter an order consistent with this Memorandum Opinion.

## MEMORANDUM OPINION AND ORDER

■ Defendant, the Governor of Kentucky, has moved for a stay of enforcement of this Court's February 27, 2014 final order, pending its appeal to the United States Court of Appeals for the Sixth Circuit. On February 28, the Court granted a stay up to and including March 20, 2014, in order to allow the state a reasonable time to implement the order. Defendant moved the Court for an extension of the stay on March 14, and the parties appeared before the Court for a telephonic hearing on the matter on March 17. Defendant filed a notice of appeal on March 18.

## I.

■ Federal Rule of Civil Procedure 62 empowers this Court to stay enforcement of its own orders and judgments. Particularly in civil matters, there are no rigid rules that govern such a stay, and courts have a fair amount of discretion. The Court will consider the following factors: (1) whether the stay applicant has made a strong showing of likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of a stay will substantially injure other parties interested in the proceedings; and (4) where the public interest lies. *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Baker v. Adams Cnty./Ohio Valley Sch. Bd.,* 310 F.3d 927, 928 (6th Cir.2002).

Here, the applicant has not made a strong showing of a likelihood of success on the merits. The district courts are so far unanimous, but no court of appeals has issued an opinion. So, one must admit that ultimate resolution of these issues is unknown.[1]

The applicant contends that the state will suffer irreparable harm—"chaos"—if the stay is not extended. It must demonstrate "irreparable harm that decidedly outweighs the harm that will be inflicted on others if a stay is granted." *Family Trust Found. of Ky., Inc. v. Ky. Judicial Conduct Comm'n,* 388 F.3d 224, 227 (6th Cir.2004) (quoting *Baker,* 310 F.3d at 928) (internal quotation marks omitted). To illustrate the irreparable harm, the applicant cites the potential granting and then taking away of same-sex marriage recognition to couples. It also cites the potential impacts on "businesses and services where

---

1. The applicant cites a potential issue of the applicability of *Baker v. Nelson,* 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). However, *Baker* dismissed for want of a substantial federal question an action requesting the issuance of a same-sex marriage license, an issue that was not before the Court in our underlying case.

marital status is relevant, including health insurance companies, creditors, [and] estate planners...." This is a legitimate concern.

■ On the other hand, Plaintiff same-sex couples argue that they would rather have their marriages recognized for a short amount of time than never at all. Plaintiffs contend that the irreparable harms cited by Defendant are actually minor bureaucratic inconveniences which cannot overcome their constitutional rights. The Court agrees that further delay would be a delay in vindicating Plaintiffs' constitutional rights and obtaining access to important government benefits. The loss of a constitutional right for even minimal periods of time constitutes irreparable harm. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998) (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)).

Finally, the applicant argues that avoiding chaos and uncertainty is in the public's best interest. However, as the Court previously noted, the public interest is twofold: that the Constitution be upheld, and that changes in the law be implemented consistently and without undue confusion. The Court has concerns about implementing an order which has dramatic effects, and then having that order reversed, which is one possibility. Under such circumstances, rights once granted could be cast in doubt.

In this Court's view, the application of these four factors is mixed.

## II.

Another issue of great concern is the significance of the Supreme Court's stay of the district court's injunction in *Herbert v. Kitchen*, —— U.S. ——, 134 S.Ct. 893, 187 L.Ed.2d 699 (2014). Since then, three additional cases in which Plaintiffs sought the issuance of marriage licenses have entered stays on their rulings pending appeal. *See Bishop v. United States ex rel. Holder*, 962 F.Supp.2d 1252, 1295–96 (N.D.Okla.2014); *Bostic v. Rainey*, 970 F.Supp.2d 456, 483–84, 2014 WL 561978, at *23 (E.D.Va.2014); *De Leon v. Perry*, SA–13–CA–00982–OLG, 975 F.Supp.2d 632, 666, 2014 WL 715741, at *28 (W.D.Tex. Feb. 26, 2014). The applicant says that it is precedential here.

Plaintiffs make a compelling argument that, at the time of the Supreme Court's guidance in *Kitchen*, the Tenth Circuit had already directed expedited briefing and argument. Here, there is no such guarantee of expedited briefing before the Sixth Circuit. It may be years before the appeals process is completed. Also, our case is different than *Kitchen*. Nevertheless, the Supreme Court has sent a strong message by its unusual intervention and order in that case. It cannot be easily ignored.

Perhaps it is difficult for Plaintiffs to understand how rights won can be delayed. It is a truth that our judicial system can act with stunning quickness, as this Court has; and then with sometimes maddening slowness. One judge may decide a case, but ultimately others have a final say. It is the entire process, however, which gives our judicial system and our judges such high credibility and acceptance. This is the way of our Constitution. It is that belief which ultimately informs the Court's decision to grant a stay. It is best that these momentous changes occur upon full review, rather than risk premature implementation or confusing changes. That does not serve anyone well.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that the stay of this Court's February 27, 2014 final order is extended until further order of the Sixth Circuit.